UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV-06-97-B-W |
| v. | ) | |
| | ) | |
| KURT ADAMS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON UNITED STATES' MOTION FOR TEMPORARY
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

On May 8, 2006, James Douglas Cowie and 21 other Verizon customers initiated a "Ten Person Complaint" with the Maine Public Utilities Commission (PUC) that has become a test of wills between the United States of America and the state of Maine. The PUC recently issued a subpoena against Verizon New England, Inc.[1] (Verizon), commanding it to attend a hearing, scheduled for tomorrow afternoon, to show cause as to why Verizon should not be held in contempt for its failure to comply with an August 9, 2006 PUC Order. On August 21, 2006, the United States filed this law suit to prevent Verizon from complying with the PUC Order, claiming that compliance would cause grave harm to national security. The United States now moves to enjoin the PUC from attempting to force compliance with its Order and proceeding with contempt proceedings against Verizon. The Court grants the United States' motion, concluding that a contempt hearing against Verizon before the PUC is an inappropriate forum for resolving a conflict between the United States and the state of Maine and that the United States' national security concerns are more compelling than the PUC's countervailing interest in speedy compliance with its August 9, 2006 Order.

---

[1] Verizon is named in the law suit as Verizon New England, Inc., d/b/a Verizon Maine.

## I.  STATEMENT OF FACTS

### A.  The Ten Person Complaint

On May 8, 2006, James Douglas Cowie and 21 other customers (Customers) of Verizon filed a "Ten Person Complaint"[2] with the Maine Public Utilities Commission (PUC), requesting that the PUC investigate whether Verizon provided customer data to the National Security Agency (NSA) in violation of state and federal law.  The Cowie complaint triggered the statutory procedure a public utility must follow upon receipt of a complaint: unless the PUC finds that the "complaint is without merit," it is required to "promptly set a date for a public hearing" and must "render a decision upon the complaint no later than 9 months after its filing."  35-A M.R.S.A. § 1302(2).  The State contends that the statutory nine-month period lapses on February 9, 2007.  After the PUC staff served notice of the complaint on Verizon, Verizon responded by neither admitting nor denying the allegations in the complaint, but arguing that the PUC had no authority to undertake the inquiry.  Soon, the Office of the Maine Public Advocate, the Maine Civil Liberties Union, and the Customers were arrayed on one side of the matter and Verizon was joined on its side by the United States Department of Justice.  Before the PUC considered the matter, the United States wrote the PUC a lengthy letter, supporting Verizon's motion to dismiss and explaining that the "proceeding would place Verizon in a position of having to confirm or deny the existence of information that cannot be confirmed or denied without harming national security."  *Letter from Assistant Att'y Gen. Keisler to Chairman Kurt Adams* dated July 28, 2006, *Aff. of Karen Geraghty*, Ex. 4 (Docket # 75).

---

[2] Under 35-A M.R.S.A. § 1302, "[w]hen a written complaint is made against a public utility by 10 persons aggrieved . . . that a regulation, measurement, practice, or act of a public utility is in any respect unreasonable, insufficient or unjustly discriminatory," the PUC "shall, with or without notice, investigate the complaint" if the PUC determines that the "petitioners are responsible . . . ."   This procedure is known as a "Ten Person Complaint."

**B.  The PUC Order of August 9, 2006**

Matters came to a head on August 9, 2006, when the PUC issued an Order against Verizon.   The Order noted that "[n]otwithstanding its claimed inability to discuss its relationship to any classified NSA programs," Verizon, in its response to the complaint, referred to two press releases, issued on May 12, 2006 and May 16, 2006, which made seven representations about whether it had provided customer information to the NSA.[3]   *Compl.* Ex. 5 at 2 (Docket # 1) (*PUC Order*).  After concluding that the representations in the press releases were "made to the [PUC] for the purpose of influencing the [PUC's] decision as to whether or not to open an investigation," the PUC Order cited a provision of Maine law that makes it a crime for "any person to make or cause to be made, in any document filed with the [PUC] or in any proceeding under this Title, any statement that, at the time and in light of the circumstances under which it is made, is false in any material respect and that the person knows is false in any material respect."  35-A M.R.S.A. § 1507-A.[4]

The PUC read the Verizon press releases "as denying that it provided customer records or call data associated with its customers in Maine to agencies of the federal

---

[3] The seven representations were:

    1) Verizon was not asked by NSA to provide, nor did Verizon provide, customer phone records from any of its businesses, or any call data from those records.

    2) None of these companies – wireless or wireline – provided customer records or call data.

    3) Verizon's wireless and wireline companies did not provide to NSA customer records or call data, local or otherwise.

    4) Verizon will provide customer information to a government agency only where authorized by law for appropriately-defined and focused purposes.

    5) When information is provided, Verizon seeks to ensure it is properly used for that purpose and is subject to appropriate safeguards against improper use.

    6) Verizon does not, and will not, provide any government agency unfettered access to its customer records or provide information to the government under circumstances that would allow a fishing expedition.

    7) Verizon acquired MCI, and Verizon is ensuring that Verizon's policies are implemented at that entity and that all its activities fully comply with law.

*Compl.* Ex. 5 at 2 (Docket # 1) (*PUC Order*).

[4] 35-A M.R.S.A. § 1507-A makes a violation of this section a Class C crime.  If the violator is a natural person, the law subjects the violator to a term of imprisonment not to exceed 5 years, 17-A M.R.S.A. § 1252(2)(C), and a fine not to exceed $5,000.00 or, if the person is an organization, a fine not to exceed $20,000.00.  17-A M.R.S.A. § 1301(1-A)(C), (3)(C).

government, and that it did not provide such agencies with access to its facilities or infrastructure in Maine such that those agencies would have direct, unfettered access to Verizon's network or the data it carries." *PUC Order* at 3.  The PUC agreed that if the representations were true, they "could satisfy the concerns raised in the complaint."  *Id.* However, the PUC was "unwilling to rely on these representations to dismiss the complaint because they do not bear sufficient indicia of truth as they are not attributed to an individual within Verizon who has decision-making authority and knowledge of the matters asserted." *Id.*   The PUC, therefore, ordered Verizon to file on or before August 21, 2006, an "affirmation that each of the seven (7) enumerated representations identified in Section II is both true and not misleading in light of the circumstances in which such affirmation is provided, and that such affirmation be made under oath by an officer of Verizon with decision-making authority and knowledge covering the subject matters asserted therein."  *Id.* at 4.  On August 21, 2006, Verizon informed the PUC that because a federal law suit was being initiated addressing the legality of the PUC's Order, it would not supply the affirmation.

### C.  The United States' Complaint

The United States filed a complaint against Kurt Adams, in his official capacity as Chairman of the PUC, additional PUC members in their official capacities, and Verizon. *Compl.* ¶¶ 4-8.  Citing the Supremacy Clause of the United States Constitution and various federal statutes, the United States alleged that Verizon's compliance with the PUC Order would place it "in a position of having to confirm or deny the existence of information that cannot be confirmed or denied without causing exceptionally grave harm to national security."  *Id.* ¶ 1.   In particular, the United States claimed that "if particular

telecommunication carriers are indeed supplying foreign intelligence information to the Federal Government, compliance with the Order or other similar order would require disclosure of the details of that activity." *Id.* The Complaint sought a declaratory judgment that the state Defendants "do not have the authority to seek confidential and sensitive federal government information." *Id.*

### D. The State's Response

The state of Maine answered the Complaint on September 12, 2006, denying its essential allegations and raising a host of affirmative defenses, including lack of jurisdiction, failure to state a claim upon which relief can be granted, ripeness, abstention, justiciability, unclean hands, sovereign immunity, and other issues. *State Defs.' Answer and Affirmative Defenses* (Docket # 6). With the United States' averments and the state of Maine's denials, the issues were joined.

### E. The Judicial Panel on Multidistrict Litigation: *In Re* National Security Agency Telecommunications Records Litigation

The dispute between the United States and the Maine PUC is not unique to Maine. On August 9, 2006, acting pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation (MDL Panel) had transferred seventeen civil actions to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings.[5] *In Re NSA Telecoms. Records Litig.*, 444 F. Supp. 2d 1332 (J.P.M.L. 2006). The MDL Panel noted that these civil actions shared "factual and legal questions regarding alleged Government surveillance of telecommunications activities" and concluded that "centralization . . . is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (particularly with respect to matters involving national security),

---

[5] The statute allows for such a transfer "[w]hen civil actions involving one or more common questions of fact are pending in different districts . . . ." 28 U.S.C. § 1407.

and conserve the resources of the parties, their counsel and the judiciary." *Id.* at 1334.  The MDL Panel recognized that there are "security concerns associated with the production of highly classified information" and a "framework should be created whereby a single transferee court (rather than the multiple courts where MDL-1791 actions and potential tagalong actions are now pending) would be charged with the task of reviewing any classified information that might need to be produced in connection with the plaintiffs' claims and the Government's assertion of the state secret defense." *Id.* at 1335.  It concluded that the Northern District of California should be the transferee forum, because it had "already established and utilized a procedure for reviewing classified information that the Government deems necessary to decide its state secret claim." *Id.*

On October 4, 2006, the MDL Panel issued a Conditional Transfer Order, transferring this case along with several others to the Northern District of California "for the reasons stated in the order of August 9, 2006 . . . ." *Conditional Transfer Order* (Docket # 12).  The PUC objected to the transfer and the MDL Panel set a briefing schedule.  *Letter from MDL Panel* (Docket # 19).  While the question of transfer was pending, the MDL Panel informed this Court that its "jurisdiction continues until any transfer ruling becomes effective." *Id.* The MDL Panel noted that if there are motions pending, this Court was "free to rule on the motion, of course, or wait until the Panel has decided the transfer issue.  The latter course may be especially appropriate if the motion raises questions likely to arise in other actions in the transferee court and, in the interest of uniformity, might best be decided there if the Panel orders centralization." *Id.*  The PUC's objection to the transfer order has been fully briefed and was argued before the MDL Panel on January 25, 2007, in Miami, Florida.

**F.  The Progress of the Case Pending Resolution of the MDL Panel Transfer Order**

Both before and after the transfer question arose, the parties and others have not been idle. James Douglas Cowie and his fellow Customers moved to intervene, *Mot. to Intervene* (Docket # 9); the PUC moved to dismiss, *State Defs.' Mot. to Dismiss* (Docket # 11); the United States moved for summary judgment, *Pl.'s Mot. for Summ. J.* (Docket # 28); and, the Maine Public Advocate moved to intervene, *Mot. to Intervene* (Docket # 38).   After the Cowie motion to intervene was ready for decision, the Court held a conference of counsel in which it informed the parties that, while they were free to continue to file motions, the Court was disinclined to rule on any substantive motions while the question of transfer remained unresolved.  *See Minute Entry* (Docket # 35).  Since then, although the Court has ruled on some procedural disputes, it has left more substantive matters undecided in deference to the possibility of transfer and to avoid the possibility of inconsistent rulings.  *See United States v. Adams*, CV-06-97-B-W, 2006 U.S. Dist. LEXIS 94539 (D. Me. Dec. 29, 2006).

### G.  The PUC Contempt Proceedings

Meanwhile, Verizon failed to produce the affirmation the PUC ordered on August 9, 2006.  Unaccustomed to having its Orders ignored and mindful of the nine-month statutory limit for responding to a Ten Person Complaint, the PUC decided to force the issue.[6]  On January 10, 2007, the PUC issued a Procedural Order, which stated that it was holding a conference of counsel on Friday, January 19, 2007, "to address the issues raised by the lead complainant, Mr. Cowie, and by the Office of the Public Advocate, in their filings of January

---

[6] On December 29, 2006, the PUC discussed what action it should take in view of the absence of compliance by Verizon and voted unanimously to issue notice of contempt proceedings.  *Aff. of Cara Mason*, Ex. 1 at 8-9 December 29, 2006 (Docket # 74).  The Commissioners discussed the likelihood that the United States would move to enjoin the contempt hearing.  *Id.* at 6 ("I mean, everyone on this case seems to argue with one voice that this is going to draw injunction as soon as we take any step forward.").  On January 9, 2007, Mr. Cowie wrote the PUC, expressing the "anxious concern" that the nine-month deadline was "barely a month away" and asking for action.  *Aff. of Karen Geraghty* Ex. 7 (Docket # 75). The same day the Public Advocate wrote a similar letter asserting that the "a final decision" on the Ten Person Complaint "must be rendered by February 7, 2007."  *Id.* Ex. 8.

9, 2007." *Mem. of United States in Supp. of Mot. for TRO and/or Prelim. Inj.* Ex. 6 (Docket # 70) (*U.S. Mem.*).  Although Verizon attended the conference, the federal government did not.  *Aff. of Karen Geraghty*, Ex. 10.

On January 30, 2007, the PUC issued a Notice of Contempt Proceedings:  Order to Show Cause. *U.S. Mem.* Ex. 4.  Although the Order referenced this law suit and Verizon's August 21, 2006 letter, the PUC stated that the "August 9, 2006 Order makes clear that the fulfillment of our duty to consider whether to open an investigation pursuant to 35-A M.R.S.A. § 1302 requires that we obtain the sworn affirmation that Verizon was ordered to, but did not, supply on August 21, 2006." *Id.*  The Order states: "Accordingly, we Order that Verizon show cause, at the February 9, 2007 hearing, why it should not be held in contempt for failure to satisfy the terms of our August 9, 2006 Order." *Id.*   With the Order, the PUC issued a Contempt Subpoena, commanding Verizon to "appear and attend at the [PUC] . . . at 3:00 p.m., on the 9th day of February, 2007, and to remain until discharged, for the purpose of testifying, producing evidence, and presenting argument at a hearing . . . . " *U.S. Mem.* Ex. 3.  It warned Verizon in capital letters that the failure to comply with the subpoena may subject it to arrest and sanctions, including fines and imprisonment.  *Id.*

**H.  The United States' Motion for Temporary Restraining Order**

The PUC contempt proceedings provoked an immediate response from the federal government and, on Monday, February 5, 2007, at the request of the United States, the Court held a telephone conference of counsel.  Upon agreement of the parties, the Court ordered an expedited motion and briefing schedule with the United States' motion and memorandum

due by noon February 6, 2007, the PUC's response due by midnight February 7, 2007, and oral argument set for 10:00 a.m. on February 8, 2007.[7]

## II. DISCUSSION

The Court applies the same four-factor analysis to evaluate both a motion for a temporary restraining order and a motion for a preliminary injunction. *Largess v. Supreme Judicial Ct. for Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993)). Those well-established factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e. the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). The party seeking relief bears the burden of demonstrating that these factors weigh in its favor. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2004).

### A. Likelihood of Success on the Merits

Among the four factors to be evaluated for the issuance of injunctive relief, the most important is the likelihood of success on the merits. In *Weaver v. Henderson*, the First Circuit wrote that the "sine qua non of that formulation is whether the plaintiffs are likely to succeed on the merits." 984 F.2d 11, 12 (1st Cir. 1993); *Philip Morris v. Harshbarger*, 159

---

[7] The Court has done its level best under extremely compressed time constraints. The briefing and argument schedule allowed precious little time with the press of other matters to research and write a decision on an issue of manifest public significance, due within hours of oral argument. The parties should understand "the temporal constraints under which the district court labored" in arriving at its decision. *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

F.3d 670, 674 (1st Cir. 1998) (stating that likelihood of success is the "touchstone of the preliminary injunction inquiry.").

This case is unusual because the parties have fully briefed the merits of the action. On September 21, 2006, the PUC filed a motion to dismiss the complaint; on October 12, 2006, the United States responded; and on October 23, 2006, the PUC replied to the response. *State Defs.' Mot. to Dismiss* (Docket # 11); *Pl.'s Mem. in Opp'n to the State Defs.' Mot. to Dismiss* (Docket # 15); *State Defs.' Reply in Supp. of Their Mot. to Dismiss* (Docket # 22). Moreover, the United States filed a motion for summary judgment on October 27, 2006; the PUC responded on December 1, 2006; the United States replied on December 22, 2006; and, the PUC sur-replied on January 8, 2007. *Pl.'s Mot. for Summ. J.* (Docket # 28); *State Defs.' Mem. in Opp'n to the Pl.'s Mot. for Summ. J.* (Docket # 46); *Pl.'s Reply in Supp. of Its Mot. for Summ. J.* (Docket # 60); *State Defs.' Sur-reply in Opp'n to Pl.'s Mot. for Summ. J.* (Docket # 66).

### 1. The PUC's Motion to Dismiss

The PUC originally argued that the United States' Complaint should be dismissed, because the Court does not have jurisdiction over Orders of the Maine PUC.[8] This argument is clearly erroneous. The Court has subject matter jurisdiction because the federal government has initiated a "civil action arising under the Constitution [and] laws . . . of the United States." 28 U.S.C. § 1331. In *Local Union No. 12004, USW v. Massachusetts*, the First Circuit wrote:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. A plaintiff who seeks injunctive relief from state

---

[8] The PUC arguments are gleaned from its motion to dismiss (Docket # 11) as well as its most recent response to the United States' motion for a temporary restraining order (Docket # 76), which expands upon arguments previously raised.

> regulation, on the ground that such regulation is pre-empted by
> a federal statute which, by virtue of the Supremacy Clause of
> the Constitution, must prevail, thus presents a federal question
> which the federal courts have jurisdiction under 28 U.S.C. §
> 1331 to resolve.

377 F.3d 64, 74 (1st Cir. 2004).

Here, the Plaintiff is the United States of America seeking to vindicate its own rights under the United States Constitution and federal statutes. *See In re Debs*, 158 U.S. 564 (1895). The Court not only has jurisdiction under 28 U.S.C. § 1331, but also under 28 U.S.C. § 1345, which grants the "district courts . . . original jurisdiction of all civil actions, suits or proceedings commenced by the United States . . . ." The United States is likely to succeed on this argument.

The PUC's primary argument now, however, is that the doctrine of abstention bars the Court from staying or enjoining the PUC contempt proceedings. While it is generally true that *Younger* abstention would require a federal district court to refrain from intervening in state court proceedings, the Court disagrees that abstention would be proper in this case. *Younger v. Harris*, 401 U.S. 37 (1971). Rather, the circumstances of this case – the United States suing the state of Maine based on concerns over national security – make abstention inappropriate. As the Ninth Circuit explained in *United States v. Morros*:

> We hold that *Younger* is inapplicable here for an even more
> basic reason. Whether it is labeled "comity," "federalism," or
> some other term, the policy objective behind *Younger*
> abstention is to "avoid unnecessary conflict between state and
> federal governments. Like the Third, Fifth, and Eleventh
> Circuits, we believe this policy lacks force where the United
> States is a litigant.

268 F.3d 695, 707 (9th Cir. 2001); *see also United States v. Dicter*, 198 F.3d 1284, 1291 (11th Cir. 1999); *United States v. Penn. Dep't of Envtl. Res.*, 923 F.2d 1071, 1078-79 (3d Cir.

1991); *United States v. Composite State Bd. of Med. Exam'rs*, 656 F.2d 131, 136 (5th Cir. 1981).  That is, "*Younger* abstention is not jurisdictional; it is a prudential limitation designed to preserve comity between state and federal courts."  *Adibi v. Cal. State Bd. of Pharm.*, No. C-05-0605 EMC, 2006 U.S. Dist. LEXIS 84050, at *20 (N.D. Cal. Nov. 9, 2006).

Moreover, even if the United States' status as a party to the litigation, by itself, does not bar the application of *Younger* abstention, the PUC nonetheless fails to satisfy the conditions under which abstention is proper.  Deference to state civil or administrative proceedings is appropriate when three conditions are satisfied: (1) the proceedings are judicial in nature, (2) they implicate important state interests, and (3) they provide an adequate opportunity to raise federal constitutional challenges.  *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 777 (1st Cir. 1990); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).  The PUC argues that because all three *Younger* elements are satisfied, the Court must abstain.

The Court agrees with the PUC that the first two conditions are satisfied:  the proceedings against Verizon are judicial in nature, as opposed to legislative, and protecting the privacy interests of Maine citizens unquestionably implicates important state interests.  Concerning the third condition, the PUC argues that it "provides an adequate forum in which the United States and the utility can raise preemption arguments.  In June of 2006 the [PUC] *invited* the United States to present its arguments, the United States did so, and the [PUC] considered them."  *State Defs.' Opp'n to Pl.'s Mot. for TRO and/or Prelim. Inj.* at 10 (Docket # 76) (*PUC Mem.*).  It is on this final point that the Court cannot agree.

This case presents serious concerns about national security and the United States argues at length that the PUC contempt proceedings "risk the disclosure of information that

might reveal or tend to reveal sensitive foreign intelligence information . . . ." *U.S. Mem.* at 4. The MDL Panel has acknowledged that this risk – disclosure of confidential information – and its attendant security concerns, is justifiable. *In Re NSA Telecoms. Records Litig.*, 444 F. Supp. 2d 1332, 1334 (J.P.M.L. 2006) (stating that there are "security concerns associated with the production of highly classified information."). Indeed, this was part of the articulated rationale for transferring similar cases to the Northern District of California. The MDL Panel stated, "the California district is one of the two districts in this litigation where a court has already established and utilized a procedure for reviewing classified information that the Government deems necessary to decide its state secret claim." *Id.* In contrast, there is nothing to suggest that the Maine PUC has ever created or utilized a procedure for reviewing classified information and nothing to suggest that that the contempt proceedings would provide the appropriate judicial oversight required for such highly sensitive matters.

The issue is not whether state courts are competent to adjudicate important constitutional issues. As the PUC vigorously argues and the Court recognizes, "the United States Supreme Court has repeatedly affirmed its faith in state judicial systems, and has recognized that state tribunals are fully capable of adjudicating difficult federal constitutional issues." *PUC Mem.* at 1-2. The problem is not, as the PUC implies, the competence of the PUC or the general capability of state courts relative to their federal counterparts. *See PUC Mem.* at 10 ("the United States does not suggest that the [PUC] is intellectually incapable of grasping the issues."). Rather, the issue is the adequacy of the forum, an issue already recognized as problematic by the MDL Panel. The Court does not agree that the Maine PUC contempt hearing can provide similar safeguards to those which few district courts in the country have demonstrated the ability to provide. Therefore, even were the Court to agree

with the PUC that this case presents a question of *Younger* abstention, the PUC has failed to satisfy the conditions for such abstention.

Nor do the cases cited by the PUC persuade the Court that other rationales for abstention exist.[9]   The PUC cites *Federal Reserve Bank of Boston v. Commissioner of Corporations and Taxation*, 449 F.2d 60 (1st Cir. 1974), as suggesting that the First Circuit would require abstention.  Yet, what the First Circuit said was "*were the case to raise a pure question of state law* -- we might think it wise to require abstention by the district court pending litigation of the state issue in the state court. Abstention in such circumstances is appropriate even when the United States is a party."  *Fed. Reserve Bank of Boston*, 449 F.2d at 64 (emphasis added).  More importantly, in finding that the "question to be litigated is largely, if not entirely, a 'federal' rather than state question," the First Circuit ultimately concluded that it would be "*inappropriate, in these particular circumstances, for the district court, while retaining jurisdiction, to abstain*."  *Id.* (emphasis added).  Similarly, the Sixth Circuit case, *United States v. Ohio,* 614 F.2d 101 (6th Cir. 1979), suggests that lower federal courts should abstain when the dispute involves questions of state law.  Because the question to be litigated in the present case is largely federal – indeed, the United States argues that matters of national security are exclusively federal – federal court abstention from state cases involving questions of state law is wholly inapplicable in the circumstances of this case.  The United States is likely to succeed on this argument.

### 2.  The United States' Motion for Summary Judgment

---

[9] In addition to *Younger* abstention, there is *Pullman* abstention.  *See R.R. Comm'n v. Pullman Co*., 312 U.S. 496 (1941).  The PUC cites to *United States v. Ohio*, which explains that, in *Pullman*, "the Supreme Court held that it was proper to defer exercise of federal jurisdiction until uncertain state-law issues were clarified in the state courts. The possibility of friction between state and federal government could thus be avoided, and the district court would not be required to make a constitutional determination based on speculative interpretation of state law."  614 F.2d 101, 104 (6th Cir. 1979).

In its motion for summary judgment, the United States points out that the PUC has ordered Verizon to confirm details of its dealings with the NSA.  In view of the information sought by the PUC, the United States contends that the PUC Order amounts to a state attempt to investigate and regulate areas exclusively vested to the federal government by the Constitution, including the obligation to conduct foreign affairs and ensure national security. The United States quotes the seminal case, *McCulloch v. Maryland*, as making clear that "[t]he States have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."  17 U.S. 316, 436 (1819).  The constitutional authority of the national government as against the state governments is at its zenith when addressing issues of foreign affairs, the national defense, and national security.  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003); *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 188 (1993).

In response to these serious contentions, the PUC insists that it has not requested information that "would frustrate the mission of the NSA by obstructing the NSA's ability to gather intelligence about potential terrorist activity."  *State Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J.* at 1.  Rather, the PUC maintains that it is asking for nothing more than what the "terrorists already know."  *Id.* at 2.  The PUC attaches to its response to the motion for summary judgment a plethora of newspaper articles to suggest that the information the United States claims is confidential and vital to national security is already public.  *See Aff. of Kathleen Peters*; Exs. 1-14 (Docket # 49).

It is painfully obvious that, in making assessments about the impact of its Order on national security, the PUC is acting beyond its depth.  The PUC's statutory area of

responsibility and expertise is to "regulate public utilities," 35-A M.R.S.A. § 103(2)(B); it is not charged with evaluating threats to national security, investigating the NSA, or holding businesses in contempt when their silence was mandated by the federal government. When confronted with a divergence of opinion as to the national security implications of the PUC Order, as between the NSA, which is charged with ensuring national security, and the PUC, which is charged with state utility regulation, the Court would be hard-pressed to rely on the assurances of the PUC over the warnings of the NSA.

That said, the record here is incomplete. It may be that the PUC's main point is correct: that the federal government is seeking to protect an improper relationship with Verizon under the guise of national security and, in doing so, is intruding upon the privacy rights of Maine citizens in contravention of the protections of the Constitution.[10] Regardless of whether this case is transferred to the Northern District of California or remains in Maine, subsequent litigation will resolve this allegation, by requiring discovery of the facts underlying the federal government's position under strict protections of judicial oversight. For now, however, the Court declines to assume that the Maine PUC is more cognizant of the national security implications of its Order than the federal government. Based on the current

---

[10] General Alexander stated in his sworn declaration that if Verizon were to confirm or deny the existence of a classified relationship with the NSA, this "could cause exceptionally grave damage to the national security of the United States." *Decl. of Lt. Gen. Alexander* Ex. 1 at 2 (Docket # 70). By proceeding with the contempt hearing despite this warning, the PUC is in effect disputing the accuracy of this sworn statement or, at least, has parsed its meaning to undercut its relevance. In fact, during oral argument, the Intervenor flatly accused the General of misrepresenting the facts. The Court is not in a position to know whether the sworn statement of the Director of the NSA is true, false or misleading. But, it is not willing to assume anything. The purpose of the transfer to the Northern District of California is to bring the case to a judge who is aware of the confidential information that the United States is relying upon to sustain the Director's declaration, and, absent transfer, the United States has represented that it is willing to share this information under confidentiality protocols with the Court. In either event, the Court will be in a much better position to assess the allegations of the PUC and the Intervenor about the Declaration once it reviews the confidential information upon which the United States relies to support its accuracy.

record, the Court concludes that the United States has demonstrated a likelihood of success on the merits of this litigation.[11]

### B.  Potential for Irreparable Harm

The Court next considers the potential for irreparable harm to the United States if the injunction sought is denied and the PUC is permitted to proceed with the contempt hearing. *See Bl(a)ck Tea Soc'y*, 378 F.3d at 11.  Typically, "irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief."  *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  As the United States acknowledges, "the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."  *U.S. Mem.* at 12 (citing *Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 102 F. 3d 12, 19 (1st Cir. 1996)).  Moreover, the "burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."  *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Therefore, the United States must demonstrate, to some degree of certainty, a serious and imminent potential for irreparable harm.

Here, the United States claims that the contempt proceedings pose a significant risk of irreparable harm to national security interests.  The United States contends,

> [C]onfirmation or denial by a carrier under oath with respect to its cooperation or lack of cooperation with NSA would directly disclose sensitive information as to an intelligence method, and thus would disclose to foreign adversaries not only what NSA is attempting to do to detect terrorist threats but how it does so. This could cause exceptionally grave damage to the national security of the United States.

---

[11] The Court's conclusion is consistent with Judge Kennelly's conclusion on a similar issue in *Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899 (N.D. Ill. 2006).  Notably, Chief Judge Walker, the judge who would have received this case, but for the PUC's objection, denied a motion to dismiss and motion for summary judgment that the United States and AT & T made on similar grounds.  *Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006).

*U.S. Mem.* at 13 (internal citations omitted).  More specifically, the United States says,

> If it is confirmed that the United States is conducting a particular intelligence activity, that it is gathering information from a particular source, or that it has gathered information on particular persons or matters, such intelligence-gathering activities would be compromised and foreign adversaries, such as al Qaeda and affiliated terrorist organizations, could use such information to avoid detection.  Even confirming that a certain intelligence activity or relationship does not exist, either in general or with respect to specific targets or channels, would cause harm to the national security because alerting our adversaries to channels that are not under surveillance could likewise help them avoid detection.

*U.S. Mem.* at 15.  The United States argues that "once privileged information is disclosed . . . the status quo ante can *never* be restored . . .  [and] once protected information is disclosed the damage is done."[12]  *Id*. (emphasis in original).  *See Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) (noting that the "Appellants' right of appeal here will become moot unless the stay is continued pending determination of the appeals. Once the documents are surrendered pursuant to the lower court's order, confidentiality will be lost for all time. The status quo could never be restored.").

In response, the State Defendants argue the United States has not demonstrated that it would be irreparably harmed.  The PUC first contends that "the Court should consider the government's long delay in seeking this relief. Courts have repeatedly recognized that such a delay is strong evidence that the moving party will not suffer irreparable injury – if such an injury were truly imminent, the party would have moved more promptly."  *PUC Mem.* at 17.

---

[12]  Given the sensitive nature of the information involved, the United States contends that the contempt proceedings present the potential for irreparable harm regardless of how Verizon responds to the PUC Order. Because Verizon may 'unintentionally reveal sensitive information that could lead to grave harm to national security as our foreign adversaries get more information," the contempt proceedings must not be permitted to proceed under any circumstances.  *U.S. Mem.* at 17.  To be sure, the United States argues that the disclosure of information in response to "legal compulsion" creates a significant risk of irreparable harm to the United States. Failure to comply with the PUC Order "may subject Verizon officials to arrest, and a finding of contempt may result in sanctions that may include fines and imprisonment, or both."  *U.S. Mem.* at 14, 15.

The Court is not persuaded by this argument.  The PUC issued the Contempt Subpoena on January 30, 2007 and the United States arranged for a telephone conference with the Court on February 5, 2007 with an intervening weekend.  The PUC argues that the United States should have moved for an injunction immediately upon filing suit on August 21, 2006, but there was no suggestion that the PUC was going to act to enforce its Order against Verizon until late December, 2006 or January, 2007.[13]

Next, the PUC contends that the affidavit submitted by Lieutenant General Alexander is based on speculation, rather than personal knowledge, contains only "generalized statements," and is "conclusory."  *PUC Mem.* at 18, 19.  This argument is very similar to the argument raised in the PUC's motion to dismiss for failure to state a claim under state secrets[14] and fares no better:  the gravamen of the Complaint does not hinge on whether the information the PUC is seeking is a "state secret" within the meaning of the privilege nor is the skepticism the PUC may have regarding the Alexander affidavit particularly relevant. The Director of the NSA has submitted a statement, sworn under oath, that Verizon may not respond to the PUC investigation without harming national security.  The PUC contention, that the affidavit – from an individual entrusted with national security – is insufficient to show the potential for irreparable harm to national security, is simply untenable.

In sum, the Court agrees with the United States.  In addition to the possibility of compromising highly sensitive, confidential information, there is the legitimate need in this case to preserve the status quo so that, ultimately, this dispute may be resolved on the merits.

---

[13] Of course, the PUC, not the United States, objected to the MDL Panel's Conditional Order and thereby delayed the transfer, if it is to take place, to California.  This was the PUC's right, but its position runs counter to its professed urgency in moving rapidly with the contempt hearing.

[14] In its motion to dismiss, the PUC claimed that the declarations of John D. Negroponte, then Director of National Intelligence, and Lieutenant General Keith B. Alexander, Director of the National Security Agency, are insufficient to invoke the state secret privilege.  The PUC claims that, because the Verizon statements are already public information, the United States is attempting to "assert the state secrets privilege where there are no secrets."  *State Defs.' Mot. to Dismiss* at 10; *Compl.* Ex. 1, 2 (Docket # 1).

The Court finds that the potential risk to security interests is significant.  But, perhaps equally significant, is the potential inability of the United States to obtain an appropriate remedy once the information is disclosed.  Not only is the damage done, as it relates to national security interests, but the United States will have been wholly deprived of its day in court on this federal dispute.  In short, the state administrative proceedings could eviscerate the merits of this pending federal matter in one fell swoop.  Therefore, the potential for irreparable harm is grave.  The dual interests of safeguarding potentially destructive information and of maintaining the status quo to allow a federal court to properly assess all relevant information on the merits weigh heavily in favor of the United States.

### C.  Balance of Relevant Impositions

Next, the Court turns to the "balance of relevant impositions," an evaluation of "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Esso Std. Oil,* 445 F.3d at 18.

#### 1.    Hardship to the PUC

Under 35-A M.R.S.A. § 1302(a), the PUC is directed to "render a decision upon the [Ten Person] complaint no later than 9 months after its filing."  Although by its terms, the PUC would appear to violate the statute if it were not to render a decision within nine months, the PUC itself has conceded that the statutory directive is not jurisdictional.[15]  There is no claim that the failure to abide by the statutory deadline will unleash a set of untoward legal consequences.

The statute charges the PUC to "regulate public utilities" and the prospect of one of Maine's public utilities flouting a written order of the PUC may have some perceived impact

---

[15] The PUC made this concession during the February 5, 2007 telephone conference of counsel.  *U.S. Mem.* at 19.

on the future ability of the PUC to accomplish its mission.   However, any impact is attenuated, speculative, and readily remedied.   The circumstances of this case are unique, since Verizon is "caught between two conflicting sovereigns."   *Mem. of Def. Verizon in Supp. of Pl.'s Mot. for TRO and/or Prelim. Inj.* at 5 (Docket # 71).

Although it might be argued that the resolution of the Ten Person Complaint would be unduly delayed, the plain fact is that if Verizon were to appear on February 9, 2007, it is predictable that whatever the PUC did would not be the last word.   Motions, appeals, and law suits would be the inevitable result and those legal actions would raise many of the same issues presented in this law suit.   There is nothing in this record to assure the Court that the February 9, 2007 hearing, if it were to take place, would bring this matter to a close.

But, most significantly, the issuance of a restraining order only delays the PUC by requiring it to wait until the serious questions raised by the federal law suit are resolved.   If the law suit is resolved in favor of the PUC, its legal authority to enforce its order will be affirmed; if not, it will be determined that the PUC never had the legal authority in the first place to enforce what it ordered.   It cannot be deemed a hardship to the PUC to require it to wait to comply with the law.

### 2.  Hardship to the United States

The United States argues that the denial of an injunction would impose a significant hardship, saying, "Defendants now threaten to act unilaterally in a manner that would threaten national security and potentially deprive the United States of its right to an adjudication of its claims and this Court of its ability to rule on the propriety of the State Defendants' challenged conduct . . . ."   *U.S. Mem.* at 20.   The revelation of sensitive

information pertaining to national security is a manifest hardship to the United States if the injunction were denied.

### 3. Balance of Hardships

It is difficult to discern any appreciable hardship to the PUC if this Court grants the injunction. The only articulable hardship is delay. The PUC itself has caused some delay in this law suit. Although the PUC certainly had the right to object to the MDL Panel's Conditional Transfer Order dated October 4, 2006, by its doing so, the case remained in flux while its objection was briefed and argued.[16] Further, there is no suggestion that Verizon's situation will be any different in the future than it is today. Finally, even though the PUC does bear an interest in the expeditious resolution of citizen complaints, this interest must be measured against the national security concerns the United States has raised.

On balance, the relative hardships are hardly comparable. The United States asserts that it faces significant threats to national security as well as being denied the opportunity to adequately address the pending claims. By contrast, the PUC simply faces the hardship of suffering the status quo.

### D. The Effect on the Public Interest

The last factor is the "effect (if any) of the court's ruling on the public interest." *Esso Std. Oil Co.*, 445 F.3d at 18. "The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383

---

[16] At today's oral argument, the United States represented that the MDL Panel commonly issues its decisions on objections to transfer orders within two to three weeks of argument. Today is two weeks from the January 25, 2007 argument and a decision from the MDL Panel could be forthcoming momentarily. At the outset of the argument, the Court earnestly suggested that the PUC agree to stay the contempt hearing until the MDL Panel ruled, so that whichever district court is to ultimately obtain jurisdiction will be the court to rule on the pending motion. The PUC refused any delay.

F. Supp. 2d 180, 193 (D. Me. 2005); *see also United States v. Zenon*, 711 F.2d 476 (1st Cir. 1983) (balancing national defense requirements against the impact of enjoining the Navy's restrictions on fishing and the environment).   Here, both parties – the federal and state governments – are uniquely positioned to represent the public interest.

Weighing in favor of an injunction is the overarching need to protect interests of national security.  The Supreme Court has written that there is a "paramount federal authority in safeguarding national security," which may justify restrictions "placed on the exercise of state power . . . ."  *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 76 n.16 (1964).  Further, the Supreme Court has stated that "[f]ew interests can be more compelling than a nation's need to ensure its own security."  *Wayte v. United States*, 470 U.S. 598, 611 (1985).

Weighing against an injunction is the manifest need to safeguard privacy.  Invading the privacy of Maine citizens on the pretext of enhancing national security is a most serious charge, and merits sober, thorough, and thoughtful consideration.  But, here, the scheduled hearing to show cause cannot properly air the respective positions of the true protagonists.  The federal court, not the PUC hearing room, is the proper forum to resolve the opposing positions of the federal and state governments.  Moreover, in this controversy, Verizon is a surrogate for the position of the federal government and it would be profoundly unfair to punish Verizon for asserting a legal position mandated by the federal government.

The public interest weighs heavily in favor of enjoining the state proceeding pending resolution of this law suit.

### III.  CONCLUSION

The Court GRANTS the United States of America's Motion for a Temporary Restraining Order and Preliminary Injunction.  The Court PRELIMINARILY ENJOINS Kurt Adams, Sharon M. Reishus, and Vendean Vafiades in their official capacities from attempting to enforce the state of Maine Public Utilities Commission Order against Verizon New England, Inc., d/b/a Verizon Maine, dated August 9, 2006.   The Court PRELIMINARILY ENJOINS Kurt Adams, Sharon M. Reishus, and Vendean Vafiades from attempting to enforce their pending contempt subpoena against Verizon New England, Inc., d/b/a Verizon Maine, or holding any hearing in connection with this matter, including the hearing currently scheduled for February 9, 2007.  Finally, the Court PRELIMINARILY ENJOINS Verizon New England, Inc., d/b/a Verizon Maine, from responding, in any fashion, to the Order dated August 9, 2006 or the pending contempt subpoena, and from attending any hearing scheduled now or in the future by Kurt Adams, Sharon M. Reishus, and Vendean Vafiades regarding this matter, including the hearing currently scheduled for February 9, 2006.  This PRELIMINARY INJUNCTION shall remain effective until further Order of this or any transferee court.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 8th day of February, 2007